**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
Maia C. Kats (to be admitted *pro hac vice*)
*mkats@cspinet.org*
Matthew B. Simon (to be admitted *pro hac vice*)
*msimon@cspinet.org*
1220 L Street, Northwest, Suite 300
Washington, District of Columbia  20005
Telephone: (202) 777-8381
Facsimile: (202) 265-4954

**REESE LLP**
Michael R. Reese (SBN 206773)
*mreese@reesellp.com*
George V. Granade (SBN 316050)
*ggranade@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York  10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiffs Teri Turner and David Lundquist
and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERI TURNER *and* DAVID LUNDQUIST, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>– against –<br><br>JAMBA, INC. *and* JAMBA JUICE COMPANY,<br><br>Defendants. | No. 3:18-cv-05168<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Teri Turner and David Lundquist (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Jamba, Inc. and Jamba Juice Company (together, "Jamba Juice" or "Defendants"), and on the basis of personal knowledge, information and belief, and investigation of counsel, allege as follows:

## NATURE OF THE ACTION

1.     Jamba Juice self-describes as a "healthful, active lifestyle brand . . . created . . . to inspire and simplify healthy living."[1]

2.     Jamba Juice owns, operates, and franchises "Jamba Juice" retail locations across the United States.

3.     Jamba Juice controls and directs the ingredients, offerings, layout, and marketing for all Jamba Juice retail locations, whether directly owned or franchised.

4.     Jamba Juice's retail locations purportedly offer, among other products, "whole fruit and vegetable smoothies" ("Smoothies").[2]

5.     Capitalizing on consumer demand, Jamba Juice markets its Smoothies as simple and nutritious. Jamba Juice claims, among other things, that the Smoothies will "[r]ejuvenate your body with . . . healthy goodness" and "help you be the best version of yourself."

6.     Jamba Juice's Smoothies, however, do not contain the ingredients, nutritional profile, and/or benefits marketed by it.

7.     Jamba Juice's "goodness" and "better-for-you" campaign consists of myriad claims and implications that are deceptive, individually and collectively, including that the Smoothies are comprised of:

    a.  whole fruits and vegetables, when juice, juice blends from concentrate, sherbet, and/or other non-whole fruit and vegetable ingredients predominate;

    b.  material "super ingredients," like kale, when other cheaper ingredients predominate;

    c.  no additives, when this is untrue;

---

[1] JAMBA, INC., SECURITIES AND EXCHANGE COMMISSION FORM 10-K REPORT, FISCAL YEAR ENDING JANUARY 3, 2017 at 4, https://goo.gl/dzYanp.

[2] *Id.*

    d.   sugars exclusively, or predominantly, from whole fruits and vegetables, when this is untrue; and/or

    e.   ingredients that in total are nutritionally equivalent to consuming whole fruits and vegetables, when this is untrue.

8.    Jamba Juice's in-store signage is a prime example of this deceptive advertising. The large and conspicuous menu board indicates, for example, that Jamba Juice's Caribbean Passion Smoothie contains five whole fruit ingredients: mango, strawberry, peach, orange, and passion fruit.

9.    Caribbean Passion contains no whole mango, orange, or passion fruit.

10.    Instead, Caribbean Passion contains: 1) Passion Fruit-Mango Juice Blend, which, in turn, consists mostly of pear juice from concentrate and white grape juice from concentrate; and 2) Orange Sherbet, a sugary confection containing numerous additives.

11.    Contrary to being simple and nutritionally on par with eating whole fruits and vegetables, Jamba Juice's Smoothies contain up to 610 calories and between 65 and 128 grams of total sugars, or approximately 15 to 30 teaspoons of total sugars.

12.    A typical 12-ounce can of non-diet soda has approximately 10 teaspoons of total sugars.

13.    Defendants' marketing misleads consumers.

14.    Relying on Jamba Juice's marketing, Plaintiffs bought the Smoothies.

15.    Plaintiffs would not have purchased the Smoothies had they known that they lacked the ingredients, nutritional profile, and/or benefits marketed by Jamba Juice.

16.    Plaintiffs would purchase the Smoothies again if they reflected the ingredients and characteristics marketed by Jamba Juice.

17.    Plaintiffs seek damages, other monetary relief, declaratory relief, and an injunction to stop Jamba Juice's misleading, false, and illegal marketing of the Smoothies.

1

## PARTIES

2

### Plaintiffs

3

18.    Plaintiff Teri Turner is a resident of Santa Rosa, California.

4

19.    During the relevant class period, Ms. Turner purchased numerous of the Smoothies,

5

including Strawberry Surf Rider, from a Jamba Juice location in Santa Rosa, California.

6

20.    Ms. Turner believed Jamba Juice's representations that the Smoothies are comprised

7

of whole fruits and vegetables; material "super ingredients"; and no additives and minimal sugar.

8

21.    She relied on these representations, including statements on the menu board and by

9

Harley Pasternak, a fitness and nutrition author and Jamba Juice spokesperson, in making her

10

purchasing decisions and would not have purchased the Smoothies had she known the Smoothies

11

did not have the aforementioned nutritional qualities, ingredients, and benefits advertised.

12

22.    Ms. Turner purchased more of, or paid more for, the Smoothies than she would have

13

had she known the truth about the products.

14

23.    Ms. Turner was injured in fact and lost money as a result of Defendants' improper

15

conduct.

16

24.    If Ms. Turner knew the Smoothies' labels and advertising were truthful and non-

17

misleading, she would continue to purchase the products in the future. At present, however, Ms.

18

Turner cannot purchase the products because she cannot be confident that the labeling and

19

advertising of the products is, and will be, truthful and non-misleading.

20

25.    Plaintiff David Lundquist is a resident of New York, New York.

21

26.    During the relevant class period, Mr. Lundquist purchased numerous of the

22

Smoothies, including Apple 'n Greens, Berry UpBeet, and Amazing Greens, from Jamba Juice

23

locations in New York, New York.

24

27.    Mr. Lundquist believed Jamba Juice's representations that the Smoothies are

25

comprised of whole fruits and vegetables; material "super ingredients"; and no additives and

26

minimal sugar.

27

28

28.     He relied on these representations, including statements on the menu board, in making his purchasing decisions and would not have purchased the Smoothies had he known the Smoothies did not have the aforementioned nutritional qualities, ingredients, and benefits advertised.

29.     Mr. Lundquist purchased more of, or paid more for, the Smoothies than he would have had he known the truth about the products.

30.     Mr. Lundquist was injured in fact and lost money as a result of Defendants' improper conduct.

31.     If Mr. Lundquist knew the Smoothies' labels and advertising were truthful and non-misleading, he would continue to purchase the products in the future. At present, however, Mr. Lundquist cannot purchase the products because he cannot be confident that the labeling and advertising of the products is, and will be, truthful and non-misleading.

**Defendants**

32.     Defendant Jamba, Inc., is a public corporation organized and existing under the laws of the State of Delaware.

33.     Defendant Jamba Juice Company, a wholly-owned subsidiary of Jamba, Inc., is a corporation organized and existing under the laws of the State of California.

34.     Defendants' principal place of business is at 3001 Dallas Parkway, Suite 140, Frisco, Texas 75034.

35.     Defendants own, operate, and franchise retail locations under the name "Jamba Juice."

36.     Jamba Juice retail operations offer, among other products, the Smoothies.

37.     There are over 800 Jamba Juice retail locations within the United States, including over 400 in California and over 20 in New York.

38.     Defendants own and operate retail locations in California and New York.

39.     Both with respect to their own retail locations and franchises, Defendants create, direct, and enforce uniform standards and practices for all Jamba Juice retail locations concerning

the Smoothies, including Smoothie offerings, ingredients, in-store signage, and point of sale displays, and all other marketing and advertising.

40.    Jamba Juice retail locations have, in fact, substantially uniform Smoothie ingredients, menus, advertising materials, and signage.

41.    Jamba Juice retail locations hold themselves out to the general public as one company—Jamba Juice.

## **JURISDICTION**

42.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, which provides for the original jurisdiction of federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiff Lundquist is a citizen of the State of New York and Defendants are citizens of the States of Delaware, Texas, and California, at least one member of the plaintiff Class is a citizen of a state different from Defendants. Further, Plaintiffs allege the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs. Finally, Plaintiffs allege "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

43.    This Court has personal jurisdiction over Defendants for several reasons, including that Jamba Juice Company is incorporated in California; Defendants have continuous and systematic contacts with California, the location of approximately 50 percent of Defendants' U.S. retail locations; and Plaintiffs' claims arise out of Defendants' conduct within California, in part because Plaintiff Turner purchased Jamba Juice Smoothies within California based on Defendants' dissemination of false and misleading information about the ingredients, nutritional profile, and/or benefits of the Smoothies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VENUE

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District, including Plaintiff Turner's purchases of the Smoothies based on Jamba Juice's dissemination of false and misleading information about the ingredients, nutritional profile, and/or benefits of the Smoothies.

## INTRADISTRICT ASSIGNMENT

45.    Assignment to the San Francisco Division or the Oakland Division is appropriate under Civil L.R. 3-2(c) and (d) because a substantial part of the events or omissions which gave rise to Plaintiffs' claims occurred within Sonoma County, including Plaintiff Turner's purchases of the Smoothies based on Jamba Juice's dissemination of false and misleading information about the ingredients, nutritional profile, and/or benefits of the Smoothies.

## FACTUAL ALLEGATIONS

**I.    Jamba Juice's Marketing Targets Health-Conscious Consumers**

46.    Jamba Juice's business strategy is "to position [itself] as a leading global health and wellness, lifestyle brand . . . to meet the needs of today's increasingly health-conscious . . . consumer."[3]

47.    Consumers increasingly seek out and pay more for foods that are perceived as nutritious.[4]

48.    Accordingly, Jamba Juice actively markets ingredients and nutritional profiles for the Smoothies (listed in Exhibit 1 appended hereto) that purport to be consistent with consumer interest in nutrition.

49.    Jamba Juice's deceptive marketing includes in-store menus and posters, digital

---

[3] JAMBA, INC., SEC FORM 10-K REPORT, *supra* note 1, at 5.

[4] Nancy Gagliardi, *Consumers Want Healthy Foods—And Will Pay More for Them*, FORBES (Feb. 18, 2015, 11:30 AM), http://goo.gl/A7Z5WN (last visited August 17, 2018) (88% of respondents willing to pay more for healthier foods); INT'L FOOD INFO. COUNCIL FOUND., WHAT'S YOUR HEALTH WORTH?: FOOD & HEALTH SURVEY 2015, at 42 (2015), http://goo.gl/4g5wNb.

media, as well as traditional advertisements. Jamba Juice also "leverage[s] the power of influencers" on blogs "to post about Jamba's nutritional benefits in an authentic voice, exponentially amplifying . . . marketing communications and reaching more consumers most interested in health and wellness."[5] Jamba Juice also promotes its Smoothies via emailing consumers.

50.     Typical examples of Jamba Juice digital media advertisements claim: "[r]ejuvenate your body with some healthy goodness from Jamba!"; "[t]here's only goodness in this cup"; "[w]e're here to help you be the best version of yourself"; and "DRINK YOUR GREENS." *See* Images 1–4.

### Images 1–4[6]



---

[5] JAMBA, INC., SEC FORM 10-K REPORT, *supra* note 1, at 6.

[6] Jamba Juice (@JambaJuice), TWITTER (Mar. 19, 2018, 6:00 AM), https://goo.gl/WZFbh8 (Image 1); Jamba Juice, INSTAGRAM (July 15, 2017), https://goo.gl/2ismzU (Image 2); Jamba Juice, INSTAGRAM (May 23, 2017), https://goo.gl/eyMvja (Image 3); Email from Jamba Juice to Teri Turner (July 26, 2018) (Image 4).







## II.   The Jamba Juice Bait and Switch

51.   Jamba Juice Smoothies are not what Jamba Juice claims and advertises them to be.

52.   Jamba Juice's labeling and marketing practices deceive consumers about the true ingredients, benefits, and/or nutritional profile of the Smoothies. Jamba Juice Smoothies typically include non-whole, cheaper, and/or nutritionally distinct, and inferior, predominant ingredients.

53.   For example, large Smoothies contain up to 610 calories and between 65 and 128 grams of total sugars, or between approximately 15 and 30 teaspoons of total sugars, each.[7] *See* Exhibit 1.

### A.   Jamba Juice Misleadingly Markets the Smoothies as In-Store Blends Made of Whole Fruits and Vegetables and/or "Super" Ingredients

54.   According to Jamba Juice's SEC filings, Jamba Juice has "focused consumers'

---

[7] The calories and sugar content of the Smoothies are based on a 28-ounce large size. Although smaller sizes are available, upon information and belief, it is Jamba Juice's corporate policy to steer consumers to larger sizes.

attention on the fresh fruits and vegetables that are used to make Jamba . . . . smoothies . . . , underscoring [Jamba Juice's] commitment to providing healthier food and beverage options and fulfilling our mission of inspiring and simplifying healthy living."[8]

55.    In the same filing, Jamba Juice describes the Smoothies as "'better-for-you' specialty beverage blends" and "whole fruit and vegetable smoothies."[9]

56.    Jamba Juice pushes its fresh, whole fruit and vegetable message through a variety of media, including large, point-of-sale menu boards, in-store advertisements, and social media.

57.    Indeed, Jamba Juice's menu board almost exclusively lists whole fruits and vegetables as ingredients for each Smoothie.

58.    Likewise, in-store signs make claims like "**Whole fruit**! *that's how we blend*. And that's what you'll be sipping from a Jamba Juice fruit smoothie—essential vitamins, minerals, fiber and other nutrients. Experience the . . . natural goodness of whole fruit. **Why settle for anything less?**" *See* Image 5 (emphasis in original).

---

[8] JAMBA, INC., SEC FORM 10-K REPORT, *supra* note 1, at 10 (emphasis added).

[9] *Id.* at 4.

**Image 5**



59.   Other advertising platforms also carry the message, variously representing that:

a.   "Ingredients matter, Jamba blends whole fruits & veggies";

b.   "Kids deserve the best. We blend it for them. Whole fruits and veggies give them real nutrition . . . ."; and

c.   "At Jamba, things didn't just get real. They've been real. Real fruits, whole vegetables, blended so you can get the most out of your smoothie." *See* Images 6–8.

**Images 6–8**[10]





[10] Jamba Juice, INSTAGRAM (Aug. 24, 2017), https://goo.gl/CzjBLZ (Image 7); Jamba Juice, INSTAGRAM (July 21, 2017), https://goo.gl/b78v5q (Image 8).

1

2

3

4

5

6

7

8

9

10

11



12    60.    In addition, in direct emails to consumers, Jamba Juice touts messages like, "DRINK

13    YOUR GREENS," with links to order online. *See* Image 9.

14    **Image 9**[11]

15

16

17

18

19

20

21

22

23

24

25    61.    One online advertisement directs customers to read an article "to find out why!"

26    "[h]onest, whole ingredients, are better blended!" *See* Image 10.

27    _____

[11] Email from Jamba Juice to Teri Turner (July 26, 2018).

28

62.    That article, written by a dietitian and published in the Los Angeles Daily News, talks extensively about the superior health benefits of blended whole fruit and vegetables *as opposed to smoothies containing fruit and vegetable juices*.[12] By its cite, Jamba Juice compounds the deception that its Smoothies consist of blended whole fruits and vegetables, when they do not.

**Image 10[13]**



63.    Jamba Juice also deceptively deflects criticism of its whole fruits and vegetables advertising on social media. For example, responding to a comment that Jamba Juice "mislead[s]" consumers by failing to "disclose" on its "menu board[s]" that Smoothies contain concentrated juice blends, Jamba Juice reiterated only that "[w]e use whole fruits and veggies." *See* Image 11.

---

[12] Leeann Weintraub, *Nutrition: A Smooth Way to Make Sure Smoothies are Healthful* (July 24, 2017), https://goo.gl/NdmyKa.

[13] Jamba Juice, FACEBOOK (2017), https://goo.gl/fEsFRi.

**Image 11[14]**

 Jamba Juice is totally misleading that first you don't disclose that the majority of your drinks are from "concentrate" then if you want to make any substitutions that you combine the concentrated juices that come together like you say yes I don't want the strawberries in my drink but Sir the apple and strawberry is one juice from concentrate then the customer says but on the menu board you list them as separate why? Why should I have to pay for 8 bucks for concentrated blended smoothie? when it cost you 25 cents to make?

Like · Reply · 1w · Edited

Jamba Juice ✔ ▇▇▇▇▇ We use real whole fruits and veggies. Our nutrition facts and ingredients are available here: http://www.jambajuice.com/menu-and-nutrition/menu

**B.    Jamba Juice's Misleading Marketing of Individual Smoothies**

64.    Jamba Juice's overall marketing deception is repeated for each Smoothie.

65.    For example, the in-store menu board lists the ingredients of Caribbean Passion as follows: mango, strawberry, peach, orange, passion fruit. The accompanying image features whole mango and passion fruit. *See* Image 12.

---

[14] Jamba Juice, FACEBOOK (May 18, 2018), https://goo.gl/aSqPwX.

**Image 12**



66.    However, Caribbean Passion contains no whole passion fruit, mango, or orange. Instead, it contains "Passion Fruit-Mango Juice Blend," which in turn is made predominantly of pear juice (from concentrate) and white grape juice (from concentrate), and "Orange Sherbet." *See* Exhibit 1.

67.    The substituted ingredients, moreover, are high in total sugars and calories. Altogether, a large Caribbean Passion has 440 calories and a whopping 95 grams of total sugars. *See id*. That is approximately the amount of total sugars in two and a half cans of soda—or approximately 23 teaspoons of total sugars in a large serving.

68.    Apple 'n Greens, Aloha Pineapple, and Strawberry Surf Rider Smoothies, among

others, follow the same deceptive marketing practice.

  69. Apple 'n Greens:

   a. Appears on the menu board as a "Fruit & Veggie" Smoothie, consisting of apple, kale, banana, mango, strawberry, and peach;

   b. Is promoted with images of whole fruits and vegetables, *see* Images 13–15; and

   c. Contains no whole apples or strawberries but instead "Apple-Strawberry Juice Blend," which is made predominantly from pear juice (from concentrate). *See* Exhibit 1.

**Images 13–15**[15]



---

[15] Jamba Juice, FACEBOOK (2016), https://goo.gl/C8Zzdv (Image 14); Jamba Juice, INSTAGRAM (June 17, 2016), https://goo.gl/Pw1T7n (Image 15).



70. Aloha Pineapple Smoothie:

    a. Lists pineapple as the first ingredient on the menu board, *see* Image 12, and prominently features images of pineapple in its marketing, *see* Image 16;

    b. Has no whole pineapple, only pineapple juice (from concentrate) and "Pineapple Sherbet," a sugary confection. *See* Exhibit 1.

**Image 16**[16]



71.   Strawberry Surf Rider:

   a.   Listed on the menu board as consisting of: strawberry, peach, lemon, lime. *See* Image 12.

   b.   The first listed ingredient on the website is "Lemonade," made predominantly from white grape juice from concentrate. *See* Exhibit 1; Image 17.

   c.   A large Strawberry Surf Rider contains 590 calories and 128 grams of total sugars (approximately 32 teaspoons). *See* Exhibit 1.

---

[16] Jamba Juice, FACEBOOK (June 16, 2017), https://goo.gl/Bk76Qt.

**Image 17**[17]



72. Pomegranate Paradise:

   a. Is described on the menu board as an "all-fruit" Smoothie with: pomegranate, strawberry, mango, peach. *See* Image 13.

   b. There is no whole pomegranate in Pomegranate Paradise. The "pomegranate" is Jamba Juice's "Pomegranate Juice Blend," which, in turn, is predominantly apple juice (from concentrate) and pear juice (from concentrate). *See* Exhibit 1.

   c. Pomegranate Juice Blend also contains "fruit and vegetable juice for color," which makes the Smoothie red like pomegranates. *See id.*

   d. A large Pomegranate Paradise has approximately 87 grams of total sugars, or 21 teaspoons.

73. Amazing Greens:

   a. Is described on the menu board as a "high-impact nutrition" Smoothie, and online as "blended, balanced cups of whole food nutrition [to] upgrade from grocery-getter to go-getter."[18]

---

[17] Jamba Juice, INSTAGRAM (May 7, 2017), https://goo.gl/RLiJxQ.

[18] *Smoothies*, JAMBA JUICE, https://goo.gl/R9RWKK (last visited Aug. 17, 2018).

b.  The name "Amazing Greens," its green appearance, the large picture of kale in the image accompanying the product on the menu board, and other marketing implies that the product is predominantly comprised of green vegetables. *See* Image 18.

c.  In fact, after kale, the second and third listed ingredients in Amazing Greens are Jamba Juice's "Lemonade" and "Peach Juice Blend," respectively. Those juices, in turn, are predominantly white grape juice and apple juice, respectively. *See* Exhibit 1.

d.  A large Amazing Greens has 610 calories and 92 grams, or approximately 22 teaspoons, of total sugars. *See* Exhibit 1.

**Image 18**



74.  Greens 'n Ginger:

a.  The menu board categorizes Greens 'n Ginger as a "fruit & veggie" Smoothie, and lists Mango, Peaches, Kale, Lemon, and Ginger as ingredients. *See* Image 13.

b.  Despite its name, its green appearance, listed ingredients, and the large, adjacent image of kale on the menu board, Greens 'n Ginger consists largely of fruit juice. *See* Exhibit 1.

c.  Indeed, Jamba Juice's "Lemonade" is the first listed ingredient in Greens 'n Ginger on Jamba Juice's website, which, in turn, is largely comprised of white grape juice. *See id*.

d.  Jamba Juice's social media advertising compounds the deception. In one post, Jamba Juice claims: "[w]hat you see is what you get in our Greens 'N Ginger! Real whole fruit and veggies, blended for the best version of you! #BetterBlended . . . #GetYourGreens #Kale." The picture accompanying the image shows large kale leaves and ginger root. *See* Image 19. Other advertising, emailed to customers, touts "DRINK YOUR GREENS," and pictures only kale and whole fruits and vegetables. *See* Image 4.

**Image 19[19]**



C.  **Jamba Juice's Marketing Deceptively Implies that the Smoothies Contain No Additives, Added Sugars, and/or Have Little or No Sugars Extraneous to Whole Fruits and Vegetables**

75.  Through its marketing, Jamba Juice claims or implies that the Smoothies contain only "real," "whole" ingredients; do not contain additives or added sugars; and/or contain little or no sugars beyond that from whole fruits and vegetables.

76.  Jamba Juice advertises, for example:

a.  "NOT FAKE NEWS: Jamba blends only real, whole ingredients to power your day!";

b.  "If you're hunting for 100% real ingredients, with no pumps, purees, or turbinado—

---

[19] Jamba Juice, INSTAGRAM (Sept. 16, 2017), https://goo.gl/4KgdFv.

they're easy to spot at Jamba"; and

    c.   "Only ingredients you can pronounce . . . Jamba blends have NO artificial preservatives, turbinado or high fructose corn syrup." *See* Images 20–22.

**Images 20–22[20]**





---

[20] Jamba Juice, INSTAGRAM (Dec. 6, 2017), https://goo.gl/hN8ZKu (Image 20); Jamba Juice, INSTAGRAM (Apr. 16, 2017), https://goo.gl/Y5vDwW (Image 21); Jamba Juice, INSTAGRAM (Dec. 5, 2017), https://goo.gl/bLg5Lo (Image 22).

77.   By claiming that the Smoothies contain no "pumps," "high fructose corn syrup," or "turbinado" (raw sugar), Jamba Juice implies that its Smoothies contain no added sugars and/or very limited sugars beyond those from blended whole fruits and vegetables.

78.   Despite this claim, Jamba Juice's sherbets and frozen yogurt, used in many of its Smoothies, contain substantial levels of sugar and corn syrup. *See* Exhibit 1.

79.   Also, despite this claim, Jamba Juice's Smoothies contain added sugars and/or substantial sugars that are not derived from whole fruits and vegetables.

80.   Contrary to its advertising that the Smoothies contain largely fruits and vegetables and only "real," "whole" ingredients consumers can "pronounce," Jamba Juice's sherbets and frozen yogurt also contain numerous additives, including: "Annatto Extract," "Caramel Coloring," "Carrageenan," "Citric Acid," "Guar Gum," "Lactic Acid," "Locust Bean Gum," "Mono and Diglycerides," and "Pectin." *See id.*

81.   Moreover, many of these non-whole fruit or vegetable ingredients are unnatural (artificial or highly processed) and some, like caramel coloring, are the subject of consumer or scientific challenges to their safety.

82.   By claiming that the Smoothies contain no additives or added sugars, when they do, and/or implying that they contain sugars predominantly from whole fruits and vegetables, Jamba Juice misleads consumers as to the Smoothies' ingredient and nutritional profiles and/or their benefits.

1

## ECONOMIC INJURY

2      83.    When purchasing the Smoothies, Plaintiffs sought products that were consistent

3    with the nutritional and ingredient profile, and/or benefits, advertised—that is, consisting of whole

4    fruits and vegetables, "super" ingredients, and/or low in sugar or without added sugars.

5      84.    Plaintiffs read and relied on Jamba Juice's misleading advertising of the Smoothies.

6      85.    Plaintiffs believed the Smoothies had the aforementioned nutritional qualities,

7    ingredients, and benefits advertised.

8      86.    As a result, Plaintiffs received beverages that lacked the nutritional and/or ingredient

9    profile, and/or benefits, that they reasonably believed the products had.

10      87.    Plaintiffs would not have purchased the Smoothies, purchased as many of the

11    Smoothies, and/or paid as much for the Smoothies absent these misrepresentations.

12      88.    Plaintiffs lost money as a result of Jamba Juice's deceptive conduct because

13    Plaintiffs did not receive the products for which they believed they paid.

14      89.    Plaintiffs altered their position to their detriment and suffered damages in an amount

15    equal to the amounts they paid for the Smoothies they purchased.

16      90.    Plaintiffs would purchase the Smoothies at issue again in the future should they have

17    the ingredient and nutritional profiles, and/or the benefits, advertised.

18      91.    By engaging in false and misleading marketing, Jamba Juice reaped, and continues

19    to reap, increased sales and profits.

20      92.    Jamba Juice knows that the qualities it markets are material to a consumer's decision

21    to purchase the Smoothies.

22      93.    Jamba Juice deliberately cultivates these misperceptions through its marketing of

23    the Smoothies. Indeed, Jamba Juice relies and capitalizes on consumer misconceptions about the

24    Smoothies.

25

26

27

28

1

## **CLASS ACTION ALLEGATIONS**

2

94. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

3

Plaintiff Teri Turner brings this action individually and on behalf of a proposed class defined as

4

follows:

5

> **The California Subclass**. All persons residing in the State of
> California who purchased one or more of the Smoothies since August

6

> 24, 2014. Plaintiff Turner asks the Court to adjudicate all remedies
> through the California Class.

7

8

95. Additionally, pursuant to Rules 23(a), (b)(2), and (b)(3), Plaintiff David Lundquist

9

brings this action individually and on behalf of a proposed class defined as follows:

10

> **The New York Subclass**. All persons who purchased one or more
> of the Smoothies in the State of New York since August 24, 2012.

11

> Plaintiff Lundquist asks the Court to adjudicate all remedies through
> the New York Class.

12

96. Collectively, the California Subclass and the New York Subclass are the "Class."

13

97. Excluded from the Class are: (a) Defendants; (b) Defendants' board members,

14

executive-level officers, and attorneys, and immediate family members of any of the foregoing

15

16

persons; (c) governmental entities; (d) the Court, the Court's immediate family, and the Court staff;

17

and (e) any person that timely and properly excludes himself or herself from the Class in accordance

18

with Court-approved procedures.

19

98. Certification of Plaintiffs' claims for class-wide treatment is appropriate because

20

Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as

21

individual Class members would use to prove the elements in individual actions alleging the same

22

claims.

23

99. **Numerosity**. The Class consists of many thousands of persons throughout the states

24

of California and New York. The Class is so numerous that joinder of all members is impracticable,

25

and the disposition of each of the Class's claims in a class action will benefit the parties and the

26

Court.

27

100. **Commonality and Predominance**. Common questions of law and fact predominate

28

over any questions affecting only individual Class members. These common questions have the

capacity to generate common answers that will drive resolution of this action. These common questions include whether:

  a. Jamba Juice contributed to, committed, or is responsible for the conduct alleged herein;

  b. Jamba Juice's conduct constitutes the violations of law alleged herein;

  c. Jamba Juice acted willfully, recklessly, negligently, or with gross negligence in committing the violations of law alleged herein;

  d. Plaintiffs and the Class members are entitled to injunctive relief; and

  e. Plaintiffs and the Class members are entitled to restitution and damages.

101. Because they were subject to the same deceptive marketing practices of the Smoothies, and because they purchased the Smoothies, all Class members were subject to the same wrongful conduct.

102. Absent Jamba Juice's material deceptions, misstatements, and omissions, Plaintiffs and the other Class members would not have purchased the Smoothies.

103. **Typicality**. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and the Class members all purchased the Smoothies and were injured thereby. The claims of Plaintiffs and the Class members are based on the same legal theories and arise from the same false and misleading conduct.

104. **Adequacy of Representation**. Plaintiffs are adequate representatives of the Class because their interests do not conflict with those of the Class members. Each Class member seeks damages reflecting a similar and discrete purchase, or similar and discrete purchases, that each Class member made. Plaintiffs have retained competent and experienced class action counsel who intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class members' interests.

105. **Injunctive or Declaratory Relief**. The requirements for maintaining a class action pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding

declaratory relief with respect to the Class as a whole.

106.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The amount at stake for each Class member, while significant, is such that individual litigation would be inefficient and cost-prohibitive. Additionally, adjudication of this controversy as a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. Plaintiffs anticipate no difficulty in the management of this action as a class action.

107.    **Notice to the Class**. Plaintiffs and their counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.***
**Unlawful Conduct Prong**
**(By Plaintiff Turner, on Behalf of the California Subclass)**

108.    Plaintiff Turner repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

109.    Plaintiff Turner brings this claim on behalf of the California Subclass for violation of the "unlawful" prong of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* (the "UCL").

110.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.

111.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures concerning Jamba Juice Smoothies, as alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "FFDCA"), and its implementing regulations, including, at least, the following sections:

a.  21 U.S.C. § 343(a), which deems food misbranded when its labeling contains a statement that is "false or misleading in any particular," with "misleading" defined to "take[] into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material," 21 U.S.C. § 321(n);

b.  21 U.S.C. § 321(n), which states the nature of a false and misleading advertisement;

c.  21 C.F.R. § 101.18(b), which prohibits true statements about ingredients that are misleading in light of the presence of other ingredients; and

d.  21 C.F.R. § 102.5(c), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein.

112.  Jamba Juice's conduct is further "unlawful" because it violates California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.* (the "FAL"), and California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.* (the "CLRA"), as discussed in the claims below.

113.  Jamba Juice's conduct also violates California's Sherman Food, Drug, and Cosmetic Law, CAL. HEALTH & SAFETY CODE § 109875 *et seq.* (the "Sherman Law"), including, at least, the following sections:

a.  section 110100 (adopting all FDA regulations as state regulations);

b.  section 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.");

c.  section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food. . . . An advertisement is false if it is false or misleading

in any particular.");

    d.   section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

    e.   section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

    f.   section 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . ."); and

    g.   section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

114.    Each of the challenged statements made, and actions taken, by Jamba Juice violates the FFDCA, CLRA, FAL, and Sherman Law, and, consequently, violates the "unlawful" prong of the UCL.

115.    Jamba Juice leveraged its deception to induce Plaintiff Turner and the members of the California Subclass to purchase products that were of lesser value and quality than advertised.

116.    Jamba Juice's deceptive marketing and labeling caused Plaintiff Turner and the members of the California Subclass to suffer injury in fact and to lose money or property, as it denied them the benefit of the bargain. Had Plaintiff Turner and the members of the California Subclass been aware of Jamba Juice's false and misleading marketing and labeling tactics, they would not have purchased the Smoothies, purchased as much of the Smoothies, or paid as much for the Smoothies.

117.    In accordance with California Business and Professions Code section 17203, Plaintiff Turner seeks an order enjoining Jamba Juice from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

118.    Plaintiff Turner also seeks an order for the disgorgement and restitution of all monies from the sale of the Smoothies that Jamba Juice unjustly acquired through acts of unlawful,

unfair, and/or fraudulent competition.

119.    Therefore, Plaintiff Turner prays for relief as set forth below.

**SECOND CLAIM**
**Violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.***
**Unfair and Fraudulent Conduct Prongs**
**(By Plaintiff Turner, on Behalf of the California Subclass)**

120.    Plaintiff Turner repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

121.    Plaintiff Turner bring this claim on behalf of the California Subclass for violation of the "unfair" and "fraudulent" prongs of the UCL.

122.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.

123.    Defendants' false and misleading marketing of Jamba Juice Smoothies, as alleged herein, constitute "unfair" business acts and practices because such conduct is immoral, unscrupulous, and offends public policy. Further, the gravity of Jamba Juice's conduct outweighs any conceivable benefit of such conduct.

124.    The acts, omissions, misrepresentations, practices, and non-disclosures of Jamba Juice, as alleged herein, constitute "fraudulent" business acts and practices, because Jamba Juice's conduct is false and misleading to Plaintiff Turner and the members of the California Subclass.

125.    Jamba Juice's marketing and labeling of its Smoothies is likely to deceive reasonable consumers about their ingredient and nutritional profile.

126.    Jamba Juice either knew or reasonably should have known that the claims in the marketing, advertising, and labeling of the Smoothies were likely to deceive reasonable consumers.

127.    In accordance with California Business & Professions Code section 17203, Plaintiff Turner seeks an order enjoining Jamba Juice from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

128.    Plaintiff Turner also seeks an order for the disgorgement and restitution of all monies from the sale of the Smoothies that were unjustly acquired through acts of unlawful, unfair,

1    and/or fraudulent competition.

2        129.    Therefore, Plaintiff Turner prays for relief as set forth below.

3                                    **THIRD CLAIM**
     **Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.***
4    **(By Plaintiff Turner, on Behalf of the California Subclass)**

5        130.    Plaintiff Turner repeats each and every allegation contained in the paragraphs above

6    and incorporates such allegations by reference herein.

7        131.    Plaintiff Turner brings this claim on behalf of the California Subclass for violation

8    of the FAL.

9        132.    The FAL prohibits making any false or misleading advertising claim. CAL. BUS. &

10   PROF. CODE § 17500.

11       133.    As alleged herein, Jamba Juice, in its marketing and labeling of the Smoothies,

12   makes "false [and] misleading advertising claim[s]," as it deceives consumers about their

13   nutritional and ingredient profiles.

14       134.    In reliance on these false and misleading advertising claims, Plaintiff Turner and the

15   members of the California Subclass purchased the Smoothies believing that they consisted of whole

16   fruits and vegetables, and/or predominantly of the "super" ingredients, named and depicted in the

17   Smoothies' marketing.

18       135.    Jamba Juice knew or should have known that the marketing and labeling of the

19   Smoothies was likely to deceive consumers.

20       136.    As a result, Plaintiff Turner and the California Subclass members seek injunctive

21   and equitable relief, restitution, and an order for the disgorgement of the funds by which Jamba

22   Juice was unjustly enriched.

23       137.    Therefore, Plaintiff Turner prays for relief as set forth below.

24                                    **FOURTH CLAIM**
     **Violation of California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.***
25   **(By Plaintiff Turner, on Behalf of the California Subclass)**
                            **(Injunctive Relief Only)**
26

27       138.    Plaintiff Turner repeats each and every allegation contained in the paragraphs above

28

and incorporates such allegations by reference herein.

139.    Plaintiff Turner brings this claim on behalf of the California Subclass for violation of the CLRA, seeking injunctive relief only.

140.    The CLRA adopts a statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes.

141.    Jamba Juice's policies, acts, and practices were designed to, and did, result in the purchase and use of the Smoothies primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a.    section 1770(a)(5), which prohibits representing that goods have a particular composition or contents that they do not have;

    b.    section 1770(a)(5), which also prohibits representing that goods have characteristics, uses, or benefits that they do not have;

    c.    section 1770(a)(7), which prohibits representing that goods are of a particular standard, quality, or grade if they are of another;

    d.    section 1770(a)(9), which prohibits advertising goods with intent not to sell them as advertised; and

    e.    section 1770(a)(16), which prohibits representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

142.    As a result, in accordance with California Civil Code section 1780(a)(2), Plaintiff Turner and the members of the California Subclass have suffered irreparable harm and seek injunctive relief in the form of an order:

    a.    enjoining Jamba Juice from continuing to engage in the deceptive practices described above;

    b.    requiring Jamba Juice to provide public notice of the true nature of the Smoothies; and

    c.    enjoining Jamba Juice from such deceptive business practices in the future.

143.    Pursuant to section 1782 of the CLRA, Plaintiff Turner hereby notifies Jamba Juice in writing of its particular violations of section 1770 of the CLRA and is demanding, among other actions, that Jamba Juice cease marketing the Smoothies as set forth in detail above and correct, repair, replace, or otherwise rectify the Smoothies that are in violation of section 1770. If Jamba Juice fails to respond to Plaintiff Turner's demand within 30 days of this notice, pursuant to section 1782 of the CLRA, Plaintiffs will amend this Class Action Complaint to request, in addition to the above relief, statutory damages, actual damages, punitive damages, interest, and attorneys' fees.

144.    Therefore, Plaintiff Turner prays for relief as set forth below.

**FIFTH CLAIM**
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Law,**
**N.Y. GEN. BUS. LAW § 349 *et seq.***
**(By Plaintiff Lundquist, on Behalf of the New York Subclass)**

145.    Plaintiff Lundquist repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

146.    Plaintiff Lundquist brings this claim on behalf of the New York Subclass for violation of section 349 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 349 *et seq.*

147.    Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 349(a).

148.    Jamba Juice's labeling and marketing of the Smoothies, as alleged herein, constitute "deceptive" acts and practices, as such conduct misled Plaintiff Lundquist and the New York Subclass as to the nutritional and ingredient profile of the Smoothies.

149.    Subsection (h) of section 349 grants private plaintiffs a right of action for violation of New York's Consumer Protection from Deceptive Acts and Practices Law, as follows:

> In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an

amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

N.Y. GEN. BUS. LAW § 349(h).

150.    In accordance with subsection (h) of section 349, Plaintiff Lundquist seeks an order enjoining Jamba Juice from continuing the unlawful deceptive acts and practices set out above. Absent a Court order enjoining the unlawful deceptive acts and practices, Jamba Juice will continue its false and misleading marketing campaign and, in doing so, irreparably harm each of the New York Subclass members.

151.    As a consequence of Jamba Juice's deceptive acts and practices, Plaintiff Lundquist and other members of the New York Subclass suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Lundquist and other members of the New York Subclass also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

152.    Therefore, Plaintiff Lundquist prays for relief as set forth below.

**SIXTH CLAIM**
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Law,**
**N.Y. GEN. BUS. LAW § 350 *et seq.***
**(By Plaintiff Lundquist, on Behalf of the New York Subclass)**

153.    Plaintiff Lundquist repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

154.    Plaintiff Lundquist brings this claim on behalf of the New York Subclass for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 350.

155.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. GEN. BUS. LAW § 350.

156.    New York General Business Law section 350-a defines "false advertising" as

"advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a.1. The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." *Id.*

157.    Jamba Juice's labeling, marketing, and advertising of the Smoothies, as alleged herein, are "misleading in a material respect" and, thus, constitute "false advertising," as they falsely represent the Smoothies as consisting of whole fruits and vegetables and/or predominantly of the "super" ingredients named and depicted in the advertising.

158.    Plaintiff Lundquist seeks an order enjoining Jamba Juice from continuing this false advertising. Absent enjoining this false advertising, Jamba Juice will continue to mislead Plaintiff Lundquist and the other members of the New York Subclass as to the ingredient and nutritional profile of the Smoothies and, in doing so, irreparably harm each of the New York Subclass members.

159.    As a direct and proximate result of Jamba Juice's violation of New York General Business Law section 350, Plaintiff Lundquist and the other members of the New York Subclass have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Lundquist and the other members of the New York Subclass also each seek actual damages or statutory damages of $500, whichever is greater, pursuant to New York General Business Law section 350-e(3), and punitive damages.

160.    Therefore, Plaintiff Lundquist prays for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request the Court to enter an Order:

A.     certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B.     declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

C.     declaring that Defendants have committed the violations of law alleged herein;

D.     providing for any and all injunctive relief the Court deems appropriate;

E.     awarding statutory damages in the maximum amount for which the law provides;

F.     awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.     providing for any and all equitable monetary relief the Court deems appropriate;

H.     awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I.     awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

J.     awarding pre- and post-judgment interest to the extent the law allows; and

K.     for such further relief as this Court may deem just and proper.

1

## DEMAND FOR JURY TRIAL

2       Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

3   trial by jury on all claims so triable.

4   Date: August 23, 2018                    Respectfully submitted,

5                                            **CENTER FOR SCIENCE IN THE PUBLIC INTEREST**

6                                            By:    _/s/ Maia C. Kats_
                                                 _____

7                                            Maia C. Kats (to be admitted _pro hac vice_)
                                             _mkats@cspinet.org_
8                                            Matthew B. Simon (to be admitted _pro hac vice_)
                                             _msimon@cspinet.org_
9                                            1220 L Street, Northwest, Suite 300
                                             Washington, District of Columbia  20005
10                                           Telephone: (202) 777-8381
                                             Facsimile: (202) 265-4954
11
                                             **REESE LLP**
12                                           Michael R. Reese (SBN 206773)
                                             _mreese@reesellp.com_
13                                           George V. Granade (SBN 316050)
                                             _ggranade@reesellp.com_
14                                           100 West 93rd Street, 16th Floor
                                             New York, New York  10025
15                                           Telephone: (212) 643-0500
                                             Facsimile: (212) 253-4272
16
                                             _Counsel for Plaintiffs Teri Turner and David Lunquist_
17                                           _and the Proposed Class_

18

19

20

21

22

23

24

25

26

27

28